FILED

MAY 1 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

NATIONAL WILDLIFE FEDERATION, a District of Columbia Non-Profit Corporation,
1400 16th Street, NW, Suite 501
Washington, D.C. 20036,

CONSERVANCY OF SOUTHWEST FLORIDA, a Florida Non-Profit Corporation,
1450 Merrihue Drive
Naples, FL 34102,

COLLIER COUNTY AUDUBON SOCIETY, a Florida Non-Profit Corporation,
660 9th Street North, Suite 32A
Naples, FL 34102,

FLORIDA WILDLIFE FEDERATION, a Florida Non-Profit Corporation
P.O. Box 6870
Tallahassee, FL 32314,

NATIONAL AUDUBON SOCIETY, INC., a New York Non-Profit Corporation
700 Broadway,
New York, NY 10003,

Plaintiffs,

vs.

FRANCIS HARVEY, in his official capacity as Secretary of the Army
101 Army Pentagon
Washington, D.C. 20310,

P. LYNN SCARLETT, in her official capacity as Acting Secretary of the U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240,

Defendants.

CASE NUMBER 1:06CV00945

JUDGE: Richard W. Roberts

DECK TYPE: Administrative Agency Review

DATE STAMP: 05/19/2006

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**STATEMENT OF THE CASE**

1. This is an action for declaratory judgment and preliminary and permanent injunctive relief to invalidate Permit Number SAJ-2001-6580 (IP-TWM) issued to Ronto Development Parklands, Inc., by the U.S. Army Corps of Engineers ("Corps") for the destruction of approximately 210 acres of wetlands in Collier County, Florida, under Section 404 of the federal Clean Water Act. The permit authorizes filling wetlands for the construction of a non-water-dependent luxury residential golfing community, Parklands Collier ("Parklands" or "Parklands Project"). These wetlands serve as habitat for the endangered wood stork, which is protected under the Endangered Species Act. They are also part of the Cocohatchee Slough, a wetlands flowway flowing from the Corkscrew Swamp Sanctuary, nesting area for a significant portion of the wood stork population in South Florida, into the Cocohatchee River and Wiggins Pass Estuary, which are considered Outstanding Florida Waters, but where water quality standards are currently being violated due to rampant development.

2. The Parklands permit depends upon a proposed adjacent project called Mirasol. As initially proposed, Mirasol would include a three-mile long, 200-foot wide drainage canal to further constrict the Cocohatchee Flowway and would include a 664-acre residential golfing community. The Section 404 permit application for Mirasol (SAJ-2000-1926(IP-HWB)), filed by J.D. Nicewonder, Jr., was denied by the Corps on December 7, 2005. Permit applications for three other adjacent residential projects to be constructed in wetlands that are part of the Cocohatchee Flowway are pending before the Corps.

3. Cumulatively, the Parklands project, in combination with adjacent developments, will adversely impact 1,500 acres of jurisdictional wetlands, reduce the historic Cocohatchee Slough to a 200-foot wide, 4-foot deep, and 3-mile long ditch, and destroy 960 acres of wood

stork core foraging habitat.

4. As set forth in detail below, Defendants are violating the Endangered Species Act ("ESA"), the Clean Water Act ("CWA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedures Act ("APA") in the following respects:

(a) The U.S. Fish and Wildlife Service ("FWS") is violating ESA §7(a)(2), 16 U.S.C. § 1536(a)(2), and APA § 706(2)(A), 5 U.S.C. § 706(2)(A), by issuing an arbitrary Biological Opinion that fails to adequately assess the impacts of the Parklands Project on the endangered wood stork. *(Count One)*

(b) The Corps is violating the CWA §§ 401, 404, 33 U.S.C. §§ 1341, 1344, applicable regulations, 40 C.F.R. § 230, and the APA § 706(2)(A), 5 U.S.C. § 706(2)(A), by arbitrarily issuing a Section 404 permit and arbitrarily concluding that issuance of this permit would not contribute to water quality standard violations. *(Count Two)*

(c) The Corps is violating NEPA § 102(2)(E), 42 U.S.C. § 4332(2)(C), and the APA § 706(2)(A), 5 U.S.C. § 706(2)(A), by issuing an arbitrary Finding of No Significant Impact which concludes that the Parklands Project would not significantly affect the human environment. *(Count Three)*

**JURISDICTION AND VENUE**

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. §§ 2201-02 (Declaratory Judgment), 16 U.S.C. § 1540(c) (actions arising under the ESA), 42 U.S.C. § 4332 (actions arising under the NEPA), and 5 U.S.C. §§ 701-06 (APA).

6. An actual and justiciable controversy now exists between the parties in which the Plaintiffs are now entitled to the relief herein sought to redress the harm Plaintiffs are now suffering and will continue to suffer if the relief is not granted.

7. Defendants have waived sovereign immunity, pursuant to 5 U.S.C. § 702.

8. Venue is proper pursuant to 28 U.S.C. § 1391(e).

**PARTIES**

9. Plaintiff National Wildlife Federation ("NWF") is a non-profit corporation organized and existing under the laws of the District of Columbia, with its headquarters in Reston, Virginia, and field offices throughout the United States. NWF is the nation's largest member-supported nonprofit conservation advocacy and education organization. NWF has approximately one million individual members nationwide, 69,086 in Florida, and affiliate organizations in 47 states and territories, including Florida. The mission of NWF is to educate, mobilize, and advocate to preserve and strengthen protection for wildlife and wild places. A major concern of NWF is the protection of water resources, such as wetlands. Since its founding in 1936, NWF has been advocating for the protection of vital resources, such as wetlands, streams and rivers, upon which wildlife depends. NWF has also been working to conserve threatened, endangered, and other imperiled species, including the endangered wood stork, since its founding. NWF also brings this action on behalf of its members, many of whom regularly enjoy and plan to continue enjoying educational, recreational, scientific and aesthetic activities in and adjacent to wood stork habitat in Collier County, Florida. Defendants' continuing failure to comply with federal laws relating to the protection of wetlands and endangered species and continuing failure to comply with the National Environmental Policy Act with regard to the

Parklands Project has harmed and will continue to directly and substantially harm the interests of the NWF and its members. The relief sought in this action, if awarded, will redress this harm.

10. Plaintiff Conservancy of Southwest Florida ("Conservancy") is a non-profit corporation organized under the laws of the State of Florida in 1964. The Conservancy has more than 6,000 members in Southwest Florida, most residing in Collier County where the Parklands Project would be located. The mission of the Conservancy is to protect the environment and natural resources of Southwest Florida. The Conservancy owns property for conservation purposes downstream of the Parklands Project on the Cocohatchee River. The Conservancy also conducts scientific, educational, and recreational activities on the waters of Wiggins Pass Estuary downstream of the Parklands Project. The Conservancy also brings this action on behalf of its members, some of whom own property and reside on the Cocohatchee River and on the Wiggins Pass Estuary downstream of the Parklands Project. Members of the Conservancy also regularly recreate on and in the waters of the Cocohatchee River and the Wiggins Pass Estuary downstream of the Parklands Project and regularly view and appreciate wildlife in the area. Members of the Conservancy also regularly visit Corkscrew Swamp Sanctuary and the Corkscrew Regional Ecosystem Watershed for viewing of endangered wood storks and other wildlife. Defendants' continuing failure to comply with federal laws relating to the protection of wetlands and endangered species and continuing failure to comply with the National Environmental Policy Act with regard to the Parklands Project has harmed and will continue to directly and substantially harm the interests of the Conservancy and its members. The relief sought in this action, if awarded, will redress this harm.

11. Plaintiff Collier County Audubon Society ("Collier Audubon") is a non-profit corporation organized under the laws of the State of Florida in 1961. Collier Audubon has more

than 2,000 members in Southwest Florida, most of who reside in Collier County, where the Parklands Collier Project and Mirasol Project would be located. The mission of Collier Audubon, as an independent chapter of National Audubon Society and Audubon of Florida, is to preserve, enhance, and restore natural habitat for the native flora and fauna in Collier County. Collier Audubon owns wetland property within the broader mapped watershed for the Cocohatchee and Imperial Rivers which is within the urban Immokalee area, as well as renting office space in downtown Naples. Collier Audubon also conducts considerable educational and recreational activities in National Audubon Society's nearby 13,000 acre Corkscrew Swamp Sanctuary, wetlands and habitat along the Cocohatchee River and Canal, and Corkscrew Regional Ecosystem Watershed Marsh Trails. These activities include formal field trips and sponsorship of many schoolchildren in outdoor educational programs at Corkscrew Swamp Sanctuary with professional staff. Collier Audubon also brings this action on behalf of its members, some of whom own property and reside on the Wiggins Pass Estuary downstream of the Parklands Collier Project. Members of Collier Audubon also regularly recreate on and in the waters of the Cocohatchee River and the Wiggins Pass Estuary downstream of the Parklands Collier Project and regularly view and appreciate wildlife in the area, including manatees, dolphins, bald eagles, ospreys, night herons and other wading birds, shorebirds, rays, sharks, sea turtles and gopher tortoises. Members of Collier Audubon also regularly visit Corkscrew Swamp Sanctuary and the Corkscrew Regional Ecosystem Watershed Marsh Trails for viewing of endangered wood storks, otters, Florida panthers, black bears, deer, alligators, swallow-tailed kites, barred owls, indigo and painted buntings, red-tailed and red–shouldered hawks, many woodpeckers, warblers and other wildlife. Defendants' continuing failure to comply with federal laws relating to the protection of wetlands and endangered species and continuing failure to comply with the

National Environmental Policy Act with regard to the Parklands Project has harmed and will continue to directly and substantially harm the interests of Collier Audubon and its members. The relief sought in this action, if awarded, will redress this harm.

12. Plaintiff Florida Wildlife Federation, Inc. ("FWF") is a private, statewide, non-profit citizen's conservation and education organization incorporated in the state of Florida. FWF is a state affiliate of Plaintiff NWF. FWF works for the protection and enjoyment of Florida's wildlife and other natural resources through education and advocacy. FWF has over 12,500 members in Florida, including approximately 380 members who reside in Collier County where the Parklands project is located. With offices in Tallahassee, St. Augustine and Naples, FWF has been actively involved in the protection of both federal and state listed endangered species, including the wood stork (*mycteria americana*). FWF brings this action on behalf of its members, some of whom own property and reside on the Cocohatchee River and on the Wiggins Pass Estuary downstream of the Parklands project. Members of FWF visit Corkscrew Swamp Sanctuary and the Corkscrew Regional Ecosystem Watershed and recreate by viewing wildlife, specifically including the wood stork. Defendants' continuing failure to comply with federal laws relating to the protection of wetlands and endangered species and continuing failure to comply with the National Environmental Policy Act with regard to the Parklands Project has harmed and will continue to directly and substantially harm the interests of FWF and its members. The relief sought in this action, if awarded, shall redress this harm.

13. Plaintiff National Audubon Society, Inc. ("National Audubon") is a non-profit corporation organized under the laws of the State of Florida in 1900. Audubon has more than 6,000 members in Southwest Florida, over 1,600 residing in Collier County, where the Parklands Project would be located. These members are also members of the local chapter, Collier County

Audubon Society. The mission of Audubon of Florida and National Audubon is to conserve and restore natural ecosystems, focusing on birds and other wildlife for the benefit of humanity and the earth's biological diversity. Audubon owns over 13,000 acres of internationally renowned and pristine, old growth bald and pond cypress forest, pine flatwoods, marsh and other highly sensitive lands at the headwaters of the Cocohatchee Slough in which this challenged project lies. The sanctuary hosts the largest breeding colonies for the endangered wood stork in the United States. Audubon conducts considerable scientific research, plus land management, educational and recreational activities both on the sanctuary and on surrounding habitats and lands. These activities are conducted by in-house professional scientists and land management staff, educational and outreach staff as well as a large dedicated group of volunteers and docents. Science and management activities include prescribed burning, exotics removal, restoration, access management, GPS satellite tagging of endangered wood storks and other research and census studies, wood stork forage site and habitat utilization of surrounding wetlands and habitats, and coordination of research, management, restoration and science activities with related work of local, state, and federal agencies as well as private landowners. Educational and outreach activities include hosting over 100,000 visitors from around the world each year, utilizing a $6 million education and visitors center, and guided by professional and volunteer docents and guides. Hundreds of school children also visit annually to participate in professionally led ecology courses in the swamp during the day, and for adults and college students, many other environmental curricula are taught throughout each year in the Discover Corkscrew program, and others. Audubon also brings this action on behalf of its members across the country, who number almost a half million, who support, visit and/or donate to Corkscrew Swamp Sanctuary. These members would be devastated materially, emotionally and spiritually if

any avoidable harm were to befall Corkscrew Swamp Sanctuary or its endangered wood stork colonies. Defendants' continuing failure to comply with federal laws relating to the protection of wetlands and endangered species and continuing failure to comply with the NEPA with regard to the Parklands Project has harmed and will continue to directly and substantially harm the wood storks and other wildlife of Corkscrew Swamp Sanctuary and the interests of Florida Audubon and its members. The relief sought in this action, if awarded, will redress this harm.

14. Defendant Francis Harvey is the Secretary of the United States Department of the Army and is legally responsible for all decisions of the Corps of Engineers in implementing the Corps' responsibilities under the CWA, NEPA, and the APA, including actions leading to the permit issued by the Corps for the filling of wetlands for the Parklands development. Defendant Harvey is hereafter referred to as the Corps.

15. Defendant P. Lynn Scarlett, is the Acting Secretary of the U.S. Department of the Interior. Defendant Scarlett is legally responsible for all decisions of the FWS, including those decisions implementing the ESA. Defendant Scarlett is hereinafter referred to as FWS.

## STATUTORY AND REGULATORY FRAMEWORK

### Administrative Procedures Act

16. Pursuant to the Federal Administrative Procedures Act ("APA"), 5 U.S.C. §§ 702, *et seq.*, any person who has suffered legal wrong because of agency action, or who is adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

17. Pursuant to 5 U.S.C. § 706 the reviewing court shall: "(2) hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law. . . ."

Endangered Species Act

18. The ESA is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 698 (1995) (*quoting Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978)). The ESA assigns the lead role for administering the law to the Secretary of the Interior and the Secretary of Commerce. With respect to inland species such as the wood stork, the duties of the Secretary of the Interior have been delegated to FWS. *See* 50 C.F.R. § 402.01(b).

19. The ESA protects plant and animal species that are listed as "endangered" or "threatened." A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range . . ." 16 U.S.C. § 1532(6).

20. Section 7(a)(2) of the ESA requires that, "in consultation with and with the assistance of [FWS]," each federal agency shall "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence" of a listed species. 16 U.S.C. § 1536(a)(2). The Corps' issuance of permits under CWA § 404 are "actions" within the meaning of ESA § 7(a)(2). *See* 50 C.F.R. § 402.02.

21. Section 7(a)(2) of the ESA requires a federal agency to determine if its activities "may affect" a listed species. 50 C.F.R. § 402.14(a). If so, the "action agency" must engage in "formal consultation" with FWS, unless FWS determines, based on the best available scientific evidence, that the action is "not likely to adversely affect" the species. 50 C.F.R. § 402.14(b). If a formal consultation is conducted, the process culminates in FWS's issuance of a biological opinion addressing, among other things, whether the activity is likely to jeopardize the species'

existence. 16 U.S.C. § 1536(b)(3)(A). The conclusion is referred to as a "jeopardy" or "no jeopardy" finding.

22. As mentioned above, ESA § 7(a)(2) has a substantive aspect that imposes a duty on a federal agency to ensure that, among other things, its actions do not jeopardize a species' existence. According to ESA regulations: "'Jeopardize the continued existence of' means to engage in an action that reasonably would be expected, directly or indirectly, to *reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild* by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (emphasis added).

Clean Water Act

23. The Clean Water Act, 33 U.S.C. §§ 1251, *et seq.*, is a comprehensive statute designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a)(2). Dredged or fill materials are pollutants under the CWA. *See* 33 U.S.C. § 1362(6). The CWA establishes a general prohibition against the discharge of pollutants into navigable waters unless a permit is first obtained pursuant to the Act. 33 U.S.C. § 1311.

24. The CWA defines "navigable waters" as "waters of the United States." 33 U.S.C. § 1362(7). Wetlands that are tributaries or adjacent to tributaries, and wetlands that otherwise influence interstate or foreign commerce are considered "waters of the United States." 33 C.F.R. § 328.3(a).

25. Section 404 of the CWA, 33 U.S.C. § 1344, authorizes the Corps to issue permits to discharge or place "dredged or fill materials" into waters of the United States, including wetlands, only at specified sites and under prescribed circumstances and conditions, and subject to oversight by the United States Environmental Protection Agency ("EPA"), the

agency authorized to administer the CWA.

26. Regulations promulgated by the EPA, pursuant to Section 404(b)(1), 33 U.S.C § 1344(b)(1) ("404(b)(1) Guidelines") further prescribe the conditions under which the Corps may issue section 404 permits and otherwise further define the Corps' duty in evaluating individual permits under the CWA.

27. The 404(b)(1) Guidelines, 40 C.F.R. Part 230, mandate a sequential review process for the evaluation of individual permits by the Corps.

28. First, the Corps must evaluate whether an activity is water dependent. If a proposal is not water dependant, the Corps must presume that an environmentally less damaging practicable alternative exists. *See* 40 C.F.R. § 230.10(a)(3).

29. Second, the applicant proposing a project that is not water dependent must show that all available alternatives to the impacts resulting from the discharge of dredged or fill material have been considered, and that no practicable alternative exists which would have less adverse impact on the aquatic environment. *See* 40 C.F.R. § 230.10(a). Absent this showing, the permit may not be issued.

30. Third, if the permit applicant establishes that no less damaging, practicable alternative is available, the applicant must then show that all appropriate and practicable steps will be taken to minimize adverse impacts of the discharge into wetlands. *See* 40 C.F.R. § 230.10(d). Absent this showing, the permit may not be issued.

31. Fourth, only after the permit applicant has shown that the avoidance and minimization criteria are satisfied may the Corps even consider compensatory mitigation. In establishing compensatory mitigation requirements, the Corps must strive to achieve a goal of no overall net loss of wetland values and functions, meaning a minimum of one-for-one functional replacement with

an adequate margin of safety to reflect scientific uncertainty. *See* Memorandum of Agreement concerning the Determination of Mitigation under the CWA § 404(b)(1) Guidelines, 55 Fed. Reg. 9210 (1990).

32. The Corps must also independently determine that the project will not cause or contribute to violations of State water quality standards. *See* 40 C.F.R. §§ 230.10(b)(1), 230.10(c). This duty exists independently of any obligation of the State to determine whether a project will cause or contribute to State water quality standards under CWA § 401, 33 U.S.C. § 1341. Absent this showing, the permit may not be issued.

33. In addition, the Corps may not issue a section 404 permit absent a state water quality certification issued or waived in accordance with CWA Section 401, 33 U.S.C. § 1341.

34. Pursuant to 40 C.F.R. § 230.11, the Corps must also fully and independently assess each project impact relating to:

(a) water circulation, fluctuation, salinity, and temperature;
(b) the substrate underlying and surrounding the aquatic environment, including the degree and impact of soil compaction;
(c) the kinds and concentrations of suspended particulate in the aquatic environment;
(d) the degree to which the fill material will impact the aquatic environment;
(e) the degree of impact on the aquatic ecosystem and organisms;
(f) the degree of cumulative effects on the aquatic environment; and
(g) the degree of secondary effects on the aquatic environment.

35. Pursuant to 40 C.F.R. § 230.5, the permitting authority for any discharge of dredge or fill material under the statute must, among other things, examine practicable alternatives to the proposed discharge, that is, not discharging into the waters of the U.S. or discharging into an alternative aquatic site with potentially less damaging consequences, evaluate the various physical and chemical components which characterize the non-living environment of the

candidate sites, the substrate and the water including its dynamic characteristics, identify and evaluate any special or critical characteristics of the candidate disposal site, and surrounding areas which might be affected by use of such site, related to their living communities or human uses, evaluate the material to be discharged to determine the possibility of chemical contamination, identify appropriate and practicable changes to the project plan to minimize the environmental impact of the discharge and impose zero net loss mitigation within the action area.

36. In addition to compliance with the Section 404(b)(1) Guidelines, the decision whether to issue a permit must be based on compliance with the Corps' own regulations requiring, among other things, an evaluation of the probable impacts on the public interest. *See* 33 C.F.R. § 320.4.

National Environmental Policy Act

37. "NEPA . . . makes environmental protection a part of the mandate of every federal agency and department," *Calvert Cliffs' Coord. Com. v. United States*, 449 F.2d 1109, 1112 (D.C. Cir. 1971), and is the "basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a). Its purpose is "to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).

38. To accomplish this purpose, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major federal actions *significantly* affecting the quality of the human environment." 42 U.S.C. § 4332(C) (emphasis added). This statement, known as an Environmental Impact Statement ("EIS"), must describe, among other items, the "environmental impact of the proposed action," any "adverse environmental effects which cannot be avoided

should the proposal be implemented," and "alternatives to the proposed action." 42 U.S.C. § 4332(C).

39. To determine "significance" (and thus whether an EIS must be prepared), the agency must consider both the context and intensity of the proposed action, including whether the project will take place in wetlands or other "ecologically critical areas" and whether endangered species will be affected. 40 C.F.R. § 1508.27. In addition, the agency must consider "the degree to which the action is related to other actions with . . . *cumulatively significant impacts* . . . ." *Id.* (emphasis added). If there is sufficient public controversy surrounding the potential impacts of a federal agency action the federal agency is required to prepare an EIS. *Id.*

40. To help determine whether this significance threshold is met, the agency may prepare an environmental assessment ("EA"). Based on the EA, a federal agency either decides to prepare an EIS or makes a finding of no significant impact ("FONSI"). *See* 40 C.F.R. §§ 1501.4, 1508.9(a)(1).

41. NEPA also requires every agency to "study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources . . . ." 42 U.S.C. § 4332(2)(E). The alternatives evaluation, "is the heart of the environmental impact statement." It should "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1508.9. NEPA requires that an EIS must "rigorously and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14. Even if an EIS is not prepared, an EA must include a discussion of "alternatives as required by section 102(2)(E)" of NEPA. 40 C.F.R. § 1508.9(b). In conjunction with CEQ's regulations, the Corps' NEPA regulations require that an EA must "provide sufficient information to the district commander on potential environmental

effects of the proposed action and, if appropriate, its alternatives." 33 C.F.R. § 230.10(a) and Part 325 Appendix B.

42. Like any other federal agency taking action that could affect the human environment, the Corps' NEPA analysis in issuing a Section 404 permit must include consideration of a full range of reasonably foreseeable, direct, indirect and cumulative impacts to "the natural and physical environment" (40 C.F.R. § 1508.14), not just impacts to wetlands or water quality.

43. Cumulative impacts are impacts on the environment which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. 40 C.F.R. § 1508.7.

44. If an EA indicates that the environmental effects of a proposal are significant, mitigation measures may be relied upon to make a finding of no significant impact only if they are imposed by statute or regulation or submitted by an applicant or agency as part of the original proposal. As a general rule, the regulations contemplate that agencies should use a broad approach in defining significance and should not rely on the possibility of mitigation as an excuse to avoid the EIS requirement. 40 C.F.R. §§ 1508.8, 1508.27.

## GENERAL ALLEGATIONS

The Parklands Development

45. The Cocohatchee Slough is one of the last remaining wetland flowways in Lee and Collier Counties. Historically, the Cocohatchee Slough was twenty (20) miles wide and slowly flowed across the land in a northeast to southwest direction from its headwaters in Corkscrew Swamp to the Cocohatchee River. Like other Southwest Florida flowways, the Cocohatchee Slough slowly guided freshwater toward the Gulf Coast, slowing the flow, storing floodwater and supplying water at times of low flow, replenishing groundwater resources, filtering pollutants, and supporting biologically diverse and economically important plants and animals. Through the years, development in south Lee County and northern Collier County has restricted the width of the Cocohatchee Slough flowway to about two miles as it crosses the county line to about two thousand feet as it flows into the Cocohatchee Canal, which is the upstream portion of the Cocohatchee River.

46. The 646-acre Parklands Project site is located partly in the surviving Cocohatchee Slough in Collier County, Florida, just south of the Collier-Lee County line, north of Immokalee Road and over one mile east of Interstate 75.

47. Over fifty percent (50%) of the Parklands site, about 342 acres, is wetlands subject to the permit requirements of Section 404 of the Clean Water Act. Endangered wood storks utilize the wetlands on the Parklands site. About 304 acres of the site are uplands, which are mostly cleared agricultural fields.

48. On February 2, 2006, the Corps issued Permit SAJ-2001-6580 (IP-TWM) to Ronto Development Parklands, Inc., for the Parklands Project, which would allow the applicant to destroy approximately 208 of the 342 acres of wetlands on the property.

49. The Parklands permit would allow the applicant to construct 1,603 residential units and a 27-hole golf course on 645 acres. In addition, the developer has dedicated 45 acres for the extension of a Collier County road through the development, called Logan Boulevard, to be constructed by the developer.

50. The eastern half of the Parklands property, where the wetlands exist, flows into the Cocohatchee Slough.

51. The Parklands permit explicitly relies upon discharge of stormwater into the so-called "regional flowway preserve" for the Mirasol, Terafina, and Olde Cypress residential developments. This "regional flowway preserve" is a euphemism for the further narrowing of the Cocohatchee Slough by creating a 200-foot wide, 4-foot deep, and 3-mile long drainage canal to further drain wetlands in the area and channelize surface water discharges from adjacent developments. This drainage canal was proposed as part of three other Section 404 permit applications for the Mirasol, Terafina, and Olde Cypress residential developments, although most of the canal was part of the application for the Mirasol Project, proposed by J.D. Nicewonder, Jr. (SAJ-2000-1926(IP-HWB)). The Mirasol application was denied by the Corps on December 7, 2005. The other applications are pending and have not been approved.

52. As mitigation for the Parklands impacts, the applicant would be required to preserve and "enhance": 157 acres on the property, including 134 acres of on-site wetlands; 322 acres of offsite land, including 296 acres of wetlands; and a 112-acre preserve, including 93 acres of wetlands, in Hendry County, Florida, as mitigation for Florida panther habitat. This "enhancement" would entail removal of exotic vegetation.

<u>Impacts on the Endangered Wood Stork</u>

53. The wood stork (*mycteria americana*) is one of two species of storks that breed in

North America. This large, long-legged inhabitant of marshes, cypress swamps, and mangrove swamps reaches the northern limit of its breeding range in the Southeastern U.S., where it breeds in colonies with great egrets, snowy egrets, white ibises, and many other species. The unique feeding method of the wood stork gives it specialized habitat requirements. Unfortunately, the habitats on which wood storks depend have been destroyed and disrupted by changes in the distribution, timing, and quantity of water flows in South Florida. The wood stork was listed as endangered in 1984 under the Endangered Species Act. Due to continued destruction and disruption of its habitat, wood stork productivity is declining in South Florida and is far from the levels required for recovery of the species.

54. Corkscrew Swamp Sanctuary, owned by National Audubon Society, Inc., is the main source of water that flows in the Cocohatchee Slough. It hosts the largest wood stork rookery in the United States and is one of the principal wood stork nesting areas in Florida. Wood stork nesting data from Corkscrew Swamp Sanctuary show that nesting pairs have declined from 4,000 – 6,000 pairs in the 1950s and 1960s to 400 – 600 pairs today.

55. The FWS Recovery Plan for the wood stork addresses the importance of protecting existing wood stork habitat in South Florida. It states that, "[a]t a minimum, for continued survival of the U.S. population, currently occupied nesting, foraging, and roosting habitat in South Florida must be protected from further loss or degradation. Watersheds supporting natural nesting habitat should remain unaltered, or be restored to function as a natural system if previously altered."

56. Wood storks use the 342 acres of wetlands on the Parklands site as part of their foraging area, and thus the proposed filling of 208 acres of wetlands on the site would destroy habitat relied upon by the wood stork to survive and recover.

57. As part of its ESA responsibilities for protection and recovery of endangered species, the Corps formally consulted with FWS over impacts of the Parklands project on the Florida panther and wood stork. This consultation culminated in a Biological Opinion ("BiOp"), which was issued by FWS on September 8, 2005.

58. The Parklands BiOp arbitrarily failed to recognize the importance of the Everglades/Big Cypress colonies, including the Corkscrew colonies, to wood stork recovery. According to the South Florida Multi-Species Recovery Plan ("MSRP"), the South Florida subpopulation of the wood stork represents 53 percent of the Florida population and 34 percent of the southeastern population. Inexplicably, the Parklands BiOp chose to focus on productivity throughout the southeastern U.S., rather than productivity within the vicinity of the action area or simply within South Florida.

59. The Parklands BiOp arbitrarily suggests that we may have met "the population size threshold of 6,000 nesting pairs for three consecutive years that is cited for downlisting wood storks," based upon faulty or misinterpreted data.

60. The preservation and enhancement of wood stork foraging habitat in the Core Foraging Areas of these South Florida colonies is essential to wood stork recovery. The Parklands development alone, however, will directly destroy an estimated 208 acres of wood stork foraging habitat and cause the incidental take of an estimated 10 wood stork nestlings each year. Parklands and the proposed adjacent development projects together will destroy at least 960 acres of wood stork foraging habitat.

61. The Parklands BiOp arbitrarily discounts as "poor" direct foraging habitat loss from the Parklands Project based on the presence of exotic vegetation, primarily melaleuca, in the wetlands slated to be dredged or filled. The BiOp thus arbitrarily concludes that the loss of

foraging habitat caused by the Parklands project is not significant.

62. The Parklands BiOp arbitrarily discounts the importance of losing short hydroperiod wetland habitat by placing a low mitigation value on this habitat.

63. The Parklands BiOp arbitrarily discounts direct, indirect, and cumulative foraging habitat loss as a small percentage of available foraging habitat by using outdated data for its estimate of "potentially suitable" foraging habitat. The BiOp simply ignores the loss of thousands of acres of wetlands in Southwest Florida in recent years.

64. The Parklands BiOp arbitrarily relies on preservation and exotics removal from existing wetlands to offset direct, indirect, and cumulative foraging habitat loss without explaining how exotic vegetation removal will offset the direct loss of 207 acres of wood stork foraging habitat resulting from the Parklands development.

65. The Parklands BiOp ignores interrelated and interdependent actions by concluding, without any explanation, that no "interrelated or interdependent actions are expected to result from the project." This statement ignores the fact that the Parklands Project is related to and hydrologically connected to the Terafina, Mirasol, Cypress Run and Olde Cypress projects. In particular, the wetlands that would be impacted by these projects are part of the Cocohatchee Flowway, which would be dramatically reduced in size by the filling of the wetlands for these projects and by the Mirasol drainage system.

66. The Parklands BiOp arbitrarily fails to assess the potential adverse effects on the wood stork prey base of deep stormwater management lakes that may introduce predator fish to foraging habitat.

67. The Parklands BiOp arbitrarily relies on the BiOp for the Mirasol Project, which has been discredited with the denial of the Mirasol permit.

68. The Parklands BiOp arbitrarily fails to analyze the cumulative effects of development projects throughout the wood stork action area.

69. The Parklands BiOp arbitrarily fails to assess the effects of past, present, and anticipated projects in the action area as part of the environmental baseline in combination with the direct and indirect effects of the action.

Alternatives and Minimization

70. The Parklands project is a residential golfing community and is not water-dependent. There were numerous available alternative properties at the time that the applicant entered the market that met the applicant's project purpose but would have less wetlands impacts than the use of the Parklands property.

71. The Parklands Collier Project is one part of a multipart development being pursued by the applicant in the immediate area, including Parklands Lee, a 324-acre residential development with golf course adjacent to the Parklands Collier project in Lee County, and Parklands West, a 314-acre residential development with golf course adjacent to the Parklands Lee Project in Lee County.

72. According to the EPA, which objected to the Parklands permit, the applicant's alternatives analysis for the project was conducted at a time when the applicant believed that it had only 7.86 acres of on-site wetlands, instead of the 342 acres determined by the Corps. This mistaken assumption led to the Parklands Collier site being arbitrarily favored over other properties which at the time were thought to have more wetlands. Based on information and belief, this erroneous alternatives analysis was relied upon by the Corps.

73. Approximately 304 contiguous acres of uplands are available on the Parklands property for construction of a residential development without the filling of wetlands. These

uplands were previously converted to agriculture and are, for the most part, cleared fields. These uplands could easily accommodate a residential community meeting the applicant's project purpose. In addition, the applicant is developing over 600 acres of land adjacent to the Parklands Collier site with little or no wetlands, which could accommodate the portions of the Parklands Collier development authorized for construction in wetlands.

74. The Corps did not perform an independent analysis of whether practicable alternatives exist to the filling of wetlands for the Parklands Project and, instead, arbitrarily accepted the applicant's flawed alternatives analysis.

75. The Corps arbitrarily failed to consider and require practicable design modifications that would minimize wetlands impacts for the Parklands project, including the elimination or reduction in size of the golf course that is part of the development.

Violation of the National Environmental Policy Act

76. In 1998 in recognition of the widespread impacts on Southwest Florida's ecosystems caused by the Corps' Section 404 wetlands dredge and fill permit program, the Corps, EPA and FWS prepared the Southwest Florida Environmental Impact Statement ("SWFEIS"), pursuant to the National Environmental Policy Act, 42 U.S.C. § 4332(C), to assess the cumulative adverse environmental effects of this permitting program. The SWFEIS was published as a Final Environmental Impact Statement in July 2000. A Record of Decision was not published until August 18, 2003.

77. The SWFEIS recognized the significant cumulative wetland losses in Lee and Collier Counties due to land development in the late 1990s. According to the SWFEIS, Corps permits alone approved at least 500 acres of wetland loss annually.

78. The Corps' own detailed analysis since publication of the SWFEIS confirmed that

the agency has permitted the destruction of over 880 wetland acres per year in the SWFEIS study area of Lee and Collier Counties since the SWFEIS process began in 1998. While these figures underestimate actual wetland losses, the inescapable fact is that the Corps permitted wetland losses at a faster rate between 1998 and 2002 than prior to the initiation of the SWFEIS process. The high rate of Corps permitted wetland losses in Southwest Florida continues with the approval of the permit for the Parklands Project and with the consideration of approximately 1,500 acres of wetlands impacts as part of pending permit applications for adjacent related projects attached to the proposed Mirasol drainage system.

79. As the SWFEIS recognizes, development projects harm Southwest Florida's natural flowways by converting them to drainage canals, by blocking the natural flow with roads and berms, and by draining and filling portions of these flowways for development. The SWFEIS identified the maintenance and restoration of historic flowways as important in reducing the harmful impacts of area dredge and fill projects, and ensuring the long-term sustainability of the Southwest Florida environment. The SWFEIS calls for section 404 permit conditions that "maintain or restore wetlands within the footprint of the slough of sufficient width for wet season flows," and where a site has a canal, conditions that would restore the original slough by partial blocking of the canal.

80. The SWFEIS shows the Parklands development and Mirasol drainage canal are in an area with a high probability that changes in land cover and land use will harm important natural resources and cause unacceptably high cumulative adverse environmental impacts. They impact several important resources of concern identified in the SWFEIS. They are adjacent to a key public acquisition area (Corkscrew Regional Ecosystem Watershed). They are also situated in a key historic flowway, a key habitat connection area for the endangered Florida panther,

marshes that provide wood stork habitat, a Strategic Habitat Conservation Area, an area of high wetland proportion, and a basin with degrading water quality.

81. The SWFEIS is a programmatic EIS for the Corps' Section 404 permit program in Southwest Florida. As such, it is not intended to be a substitute for a project-specific EIS.

82. The SWFEIS did not recommend an environmentally preferable alternative or determine whether the environmental impacts of any the alternatives studied would be acceptable.

83. The Record of Decision ("ROD") for the SWFEIS was issued on August 18, 2003. The changes to the Section 404 regulatory program recommended by the SWFEIS were not followed in the ROD.

84. The Corps did not comply with the recommendations of the SWFEIS in its review of the permit application for the Parklands Project.

85. Although the Parklands project, in combination with adjacent developments, will adversely impact 1,500 acres of jurisdictional wetlands, reduce the historic Cocohatchee Slough to a 200-foot wide, 4-foot deep, and 3-mile long ditch, and destroy 960 acres of wood stork core foraging habitat, the Corps did not prepare an EIS for the approval of the Section 404 permit for the Parklands Project. Instead, the agency included an EA and FONSI with its permit approval as part of its "Memorandum for Record."

86. The Corps' EA and FONSI for the Parklands project fails to adequately analyze the direct, indirect, and cumulative adverse effects of the Parklands project on the Cocohatchee Slough and its wetlands.

Water Quality Impacts

87. The Parklands project is located in the Cocohatchee River watershed, upstream of

the Cocahatchee River Canal, which flows into the Cocohatchee River then into the Wiggins Pass Estuary and the Gulf of Mexico. According to the Florida Department of the Environmental Protection ("DEP") and EPA, the Cocohatchee River Canal is not meeting water quality standards issued pursuant to Section 303(d) of the CWA, 33 U.S.C. § 1343(d), due to low dissolved oxygen and high iron. Similarly, according to the DEP and EPA, the Cocohatchee River does not meet water quality standards due to high biochemical oxygen demand ("BOD"), low dissolved oxygen, and high coliform bacteria (fecal and total). The Parklands project, together with adjacent projects, would contribute to violations of water quality standards for dissolved oxygen and BOD.

88. The Cocohatchee River and the Wiggins Pass Estuarine Area have been designated as Outstanding Florida Waters ("OFWs") by the State of Florida warranting special protection to avoid water quality degradation. No degradation of the quality of these waters is permitted under either state or federal law, yet such degradation has occurred and is occurring.

89. In July and August 2002, EPA objected to the Parklands permit due to likely impacts on water quality, among other reasons.

90. The Parklands Permit relies upon water quality certification by the State of Florida, pursuant to Section 401 of the Clean Water Act, § 33 U.S.C. 1341, which is contained in the South Florida Water Management District's ("SFWMD") Environmental Resource Permit No. 11-02231-P. This State permit provides that the receiving water body for stormwater discharges is the "Cocohatchee Canal via Mirasol flowway." This State permit also provides that "[t]he construction of the Mirasol flowway and the associated control structures on the flowway shall be completed in conjunction with any construction on the [Parklands] project site." This Mirasol flowway was a component of the Mirasol J.D. Nicewonder, Jr., permit application,

which was denied by the Corps. Therefore, neither the Parklands project nor the Mirasol "flowway" can be built as authorized by the SFWMD permit and CWA Section 401 water quality certification.

91. EPA objected to the Corps' issuance of the Parklands permit absent a modification in the SFWMD permit and CWA Section 401 water quality certification that reflected the Corps' denial of the Mirasol "flowway" permit.

92. The Parklands permit also relies upon the arbitrary determination by the Corps that the Parklands development would not cause or contribute to violations of water quality standards based upon an evaluation with the so-called "Harper methodology," which was approved by the Corps and EPA for use in Section 404 permitting in Southwest Florida as part of the ROD for the SWFEIS. This methodology for estimating post-development versus pre-development pollutant discharges from a parcel of property proposed for development was developed by a consultant to major Southwest Florida developers. The Harper methodology is scientifically flawed and based upon erroneous assumptions, including an assumption that natural wetlands are sources of pollutants, and based on erroneous data, including data used to ascribe pollutant loadings to natural wetlands in comparing their pollution potential to developed land with stormwater treatment ponds. The Harper methodology has been the subject of two scientific peer reviews, including one by EPA, both of which found that the methodology is flawed.

93. The Corps' EA and FONSI fail to consider the direct, indirect, and cumulative adverse effects on downstream water quality of the Parklands project individually and in conjunction with the Mirasol drainage system and adjacent projects.

## SPECIFIC ALLEGATIONS

Count One: FWS's Violations of ESA § 7(a)(2) and APA § 706(2)(A)

94. Plaintiffs incorporate by reference each and every other allegation in this complaint.

95. The FWS prepared a biological opinion for the Parklands Project and its effects on the wood stork as required by Section 7 of the ESA. In issuing the biological opinion, FWS arbitrarily concluded that the Parklands Project is not like jeopardize the continued existence of the wood stork in the wild, even after taking into account the status of the wood stork, the environmental baseline, the effects of the action, and cumulative effects.

96. In preparing the BiOp, FWS arbitrarily and capriciously failed to: (i) use the best available scientific data; (ii) make a rational connection between its conclusion that the wood stork will not be jeopardized and the facts in the record; (iii) discuss relevant baseline conditions; (iv) discuss relevant factors relating to direct and indirect effects of the action; (v) discuss relevant factors relating to interrelated and interdependent actions; and (vi) provide a meaningful cumulative impacts analysis. As such, the FWS violated Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and Section 706(2)(A) of the APA, 5 U.S.C. § 706(2)(A).

Count Two: Clean Water Act and APA § 706(2)(A)

97. Plaintiffs incorporate by reference each and every other allegation in this Complaint.

98. The wetlands on the Parklands site are waters of the United States, and a permit is required for dredging and filling them under Section 404 of the Clean Water Act, 33 U.S.C. § 1344.

99. Parklands, a golf course/residential community, is not water dependent and,

therefore, a practicable alternative to impacting wetlands is presumed to exist, pursuant to 40 C.F.R. § 230.10(a). The Parklands permit application did not contain an adequate evaluation of alternatives to the proposed project, and the application did not overcome the presumption that practicable alternatives exist. Neither did the Corps produce an adequate independent evaluation of alternatives in its permit decision. Therefore, the Corps' permit decision is arbitrary and capricious.

100. The Parklands permit will cause or contribute to state water quality standard violations in surrounding wetlands, in downstream waters of the Cocohatchee River Canal, the Cocohatchee River and the Wiggins Pass Estuary, and will cause or contribute to significant degradation of these waters. Therefore, the permit violates 40 C.F.R. §§ 230.10(b)(1) and 230.10(c).

101. The determination that the Parklands development would not cause or contribute to violations of water quality standards is arbitrary and capricious and in violation of CWA section 401 and 40 C.F.R. 230.10(b), because it is based on a state 401 water quality certification that is premised upon discharge to the Mirasol "flowway" – a discharge that has been denied by the Corps.

102. The Corps' determination that the Parklands development would not cause or contribute to violations of water quality standards is arbitrary and capricious, because it is based upon a flawed methodology that has received negative scientific peer review by EPA and the Florida Department of Environmental Protection. The Corps has violated and continues to violate 40 C.F.R. §§ 230.10(b) and 230.10(c) by arbitrarily and capriciously determining that the Parklands project will not violate water quality standards by their reliance upon the flawed methodology.

103. Neither FWS nor the Corps has ensured that the Parklands permit, taking into account the status of the wood stork, the environmental baseline, the effects of the action, and cumulative effects, will not jeopardize the continued existence of the wood stork in the wild. Thus the permit violates 40 C.F.R. § 230.10(b)(3). The Corps' reliance upon the flawed Parklands BiOp is arbitrary and capricious.

104. Appropriate and practicable steps have not been taken in the Parklands permit to minimize adverse effects of Parklands, thereby violating 40 C.F.R. § 230.10(d).

105. The Corps failure to follow the provisions of the Clean Water Act and rules and guidance promulgated by EPA and the Corps, as well as reliance on a flawed methodology, is a violation of Section 706(2)(A) of the APA, 5 U.S.C. § 706(2)(A).

Count Three: Corps' Violations of NEPA § 102(2)(E) and APA § 706(2)(A)

106. Plaintiffs incorporate by reference each and every other allegation in this Complaint.

107. The permit for the Parklands Project issued by the Corps is a "major federal action significantly affecting the quality of the human environment," pursuant to 42 U.S.C. § 4332(2)(C).

108. The Corps has violated NEPA, 42 U.S.C. § 4332(2), and the APA's prohibition against arbitrary and capricious actions, 5 U.S.C. § 706(2)(A), by issuing the Parklands permit without evaluating the impacts of the permit in an EIS.

109. The EA prepared by the Corps in approving the Parklands permit is arbitrary and capricious and does not satisfy the legal requirements of the NEPA and implementing regulations.

110. The Corps' EA fails to independently assess whether Mirasol minimized and

mitigated for impacts to the maximum extent practicable.

111. The Corps' EA fails to independently assess the water quality impacts of the Parklands development.

112. The Corps' EA fails to adequately assess the direct, indirect, and cumulative adverse impacts to wood storks.

113. The Corps' EA fails to adequately assess cumulative and secondary effects of the project on wetlands, water quality, and fish and wildlife habitat.

114. The Corps has violated NEPA, 42 U.S.C. § 4332(2), and the APA, 5 U.S.C. § 706 (2)(A), by issuing a FONSI for the Parklands permit that is arbitrary, capricious, and otherwise not in accordance with the law.

115. Plaintiffs and their members have been and will be harmed by the Corps' failure to take the requisite "hard look" at the direct, indirect, and cumulative adverse environmental effects of its permit decisions in the Cocohatchee watershed and the Southwest Florida region.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Honorable Court grant the following relief:

A. Declare that FWS's no-jeopardy biological opinion for the Parklands Project is invalid and in violation of ESA § 7(a)(2) and APA § 706(2)(A).

B. Declare that the Parklands Permit, Permit No. SAJ-2001-6580 (IP-TWM), issued under Section 404 of the Clean Water Act is invalid and that issuance of the permit violated CWA §§ 401 and 404, APA § 706(2)(A) and applicable regulations.

C. Declare that the Parklands Permit, Permit No. SAJ-2001-6580 (IP-TWM), issued under Section 404 of the Clean Water Act is invalid and that issuance of the permit without preparation of an EIS violated NEPA § 102, APA § 706(2)(A) and applicable regulations.

D. Declare that the Corps' Finding of No Significant Impact for the Parklands Project is invalid and in violation of NEPA § 102(2)(C) and APA § 706(2)(A).

E. Remand the Parklands BiOp so that FWS may prepare a complete an adequate BiOp using the best available scientific data and fully evaluating all effects on the wood stork.

F. Order the Corps to immediately revoke the Parkland Permit pending completion of an EIS and adequate ESA and CWA analyses.

G. Preliminarily and permanently enjoin the Corps from taking any action on a new or revised permit application unless and until it has prepared a final EIS and FWS has prepared an adequate BiOp.

H. Award Plaintiffs their reasonable costs and attorney fees.

I. Provide such further and additional relief as the Court deems just and proper.

Respectfully submitted,

Dated: May 19, 2006

John Kostyack, DC Bar No. 415484
Mary Randolph Sargent, DC Bar No. 471907
National Wildlife Federation
1400 16th Street, NW, Suite 501
Washington DC 20036
(202) 797-6865

Jan Goldman-Carter, DC Bar No. 415773
4312 46th St, NW
Washington DC 20016
(952) 807-3149

Gary A. Davis
Attorney at Law
P.O. Box 649
61 North Andrews Ave.
Hot Springs, NC 28743
(828) 622-0044

Attorneys for Plaintiffs